Affliction Holdings v. Utah Vap, Case 18-4146. Mr. Blakely, you are from Manhattan Beach? I'm from Huntsville, Utah and Beach, California. Huntsville, Utah. You're from Manhattan Beach, right? Both of those places. My office is in Manhattan Beach, California. Oh, all right. All right. So you're from everywhere. You're the, if you pardon the expression, the ubiquitous Mr. Blakely. Pardon me, Your Honor? The ubiquitous Mr. Blakely. You're everywhere. Yes. All right. Let's hear from you. Your Honors, may it please the Court, my name is Brent Blakely and I represent the appellant affliction. I'd like to reserve three minutes of my time for rebuttal, if possible. Today I'm going to use my time explaining why the district court committed error when it failed to view this case in the context of post-sale and initial interest confusion and then weighed the evidence on summary judgment. At the heart of any trademark case is likelihood of confusion. The various circuits have developed tests to help the courts ascertain whether there's been likelihood of confusion, but it's very important that these tests are simply a guide. Most importantly, particularly in the context of this case, is that these factors are to be viewed in the context of the case at issue. A case Your Honor was on, 1-800-CONTACTS, is, explained this point very accurately, and that was an initial interest case involving keyword advertising. So, for instance, if Coca-Cola purchased Pepsi as a keyword to drive sales to an ad buy on Google, where you type it in, Pepsi, then you see a Coca-Cola ad up top. No one's confused that that ad is a Pepsi ad. It's clear that it's a Coca-Cola ad. However, if you went through and wrote an application of the factors, marks are the same, same type of goods, same marketing channels, marks strong. You're always going to find confusion. And in this case, this court actually cited to a case that I had a couple years prior, Network Automation, which had almost the exact same factors. And the Ninth Circuit actually reconfigured the sleep craft factors, which we call it in the Ninth Circuit, to deal with that situation. It's particularly important in this case, which is primarily a post-sale confusion case. It is also initial interest, but it's really not a point-of-sale case, and I would not argue point-of-sale trial. It is a post-sale confusion case. And why that's so important is, based upon the context, certain factors in the likelihood of confusion analysis are either minimized or drop off altogether, and other factors take prominence. Walk us through your view of the post-sale principles. Post-sale confusion is a situation where the person who actually purchases the product may not have been confused in the first place, and may actually know that he's not buying, he or she's buying an authentic product. And it's confusion in the observer, out in, you know, just observing this item, whether it be a Chanel bag at a coffee shop, you know, and this is why strength is so important, that it's a Chanel bag, when in fact it's not. Or probably a situation like in this case, where someone's just walking down the street with one of these vape affliction t-shirts, which has affliction, the same circle, the same floral leaf-type image, you know, and they would assume, oh, that's relative affliction. And so, again, it also is important how the mark is viewed in context. You know, you're not supposed to view these marks side by side. The only time you ever do that is when you're trying to ascertain whether or not a mark is counterfeit. You compare the mark to the trademark application, basically. You're supposed to view it in how it appears in commerce, or how it appears in public. So if you're viewing one of these t-shirts, or the example I gave, a Chanel bag in a coffee shop, it wouldn't be at point of sale at a cash register with, you know, the thought in mind of already understanding what a Chanel or Burberry or Coach bag looks like. It's viewed in, you know, just walking down the street. Well, maybe you can just help us understand how that affects the factors. I think that it affects it in several ways. In a post-sale confusion case, strength of the mark is really of primary importance. In other words, if I make 100 shirts and put blankly on them and walk down the street, no one's going to, you know, they're not going to think of it as coming from sources. You know. That's okay. I'm not known for my 100 shirts. But if there's a Nike swoosh on it, or something similar, or, for instance, a, you know, Coach bag, or a Burberry bag, or a Chanel bag, or a Michael Kors bag, whom I've all done cases for, and it had this very same scenario, because the mark is so well known, the consumer is immediately going to assume that the source of that bag is the trademark holder, or that they authorized it, or sponsored it, or, you know, that there's some affiliation between that handbag and the trademark holder. And that's why the type of goods is also very important in a post-sale situation. In other words, if someone sees this infringing or copied Chanel handbag, well, Chanel sells handbags. So Chanel is, you know, it's going to be easier to make that connection. But it's also why marketing channels is really relevant in this analysis, because in a post-sale context, it doesn't matter where they purchased the bag originally, whether it's from a street vendor or wherever. What's important is how it is viewed in the context of the post-sale confusion, which is also why similarity of the marks is also an important factor, too. So then, sorry, but how did, what error, then, did the district court make that ties into this argument? Well, the district court didn't even consider post-sale confusion. The district court considered this case as purely a point-of-sale case. The district court had a throwaway line about there's no evidence of post-sale confusion. That's, you know, that was error to say that. I mean, it's strength of the mark is strength of the mark. So basically, the district court mischaracterized or misunderstood what kind of a case this was, and that just tainted the evaluation of factors. Is that the argument? Exactly, Margaret. And that's, you know, and we put that front and center in the opposition, and I'm not sure if you've read the transcript, but I was, I mean, I, you know, gave a lecture on post-sale confusion during our argument. And initial interest confusion as well. The court didn't even discuss initial interest confusion. This is less of an initial interest confusion case because then marketing channels does come into play. You know, initial interest, you, you know, the argument is you see their store. It says Dape Affliction, same kind of logo. And you're like, oh, Affliction's getting into vape products. Affliction's a well-known brand. All right, I'll go check it out. You walk in, you might be dissuaded. You know, I'm like, oh, all right, this is a Dape store. This is not Affliction, but I love this stuff. I'm going to buy it anyway. I do a lot of those cases for like Ray-Ban and Oakley with kiosks in the malls where you see a kiosk that says Ray-Ban and glasses that look a lot like Ray-Ban glasses, but then you come up to it, and it's like just like in smaller print. You're like, oh, so it's not a real Ray-Ban, but it's $20, and it's, you know, and you have initial interest confusion. But going to directly answer your question, yes, the district court did not analyze these facts and these factors in the context of post-sale confusion. I mean, it was just simply a point-of-sale analysis and relied upon cases like Hornady or Big Dogs for point-of-sale cases, and clearly not analogous to this case, which is also just kind of, you know, a quote that I like from the 1-800 case is, the analysis by 1-800, and in this case, vague affliction, illustrates the danger of applying the factors mechanically without intentional context. You know, those cases stressed marketing channels, stressed consumer care. I mean, they're just factually completely different than this case where you've got incredibly strong work. I think they've done 275 million in sales over the last six years. They've spent millions in advertising. They have incontestable marks. You know, they've been around for a long time. They were originally part, you know, really known for the mixed martial arts, and now they've kind of branded out into different accessories. You know, this is an incredibly strong brand. Mr. Blakely? Oh, sorry. Sorry. I didn't mean to talk over you, but just a quick question. Do you want us to reverse on just post-sale confusion? You had briefed point-of-sale confusion, initial interest confusion, and post-sale confusion, and if we were to just address all of those, it sounds like we would be wasting everybody's time, because it sounds like if you're able to obtain reversal and remand, you're only going to prosecute a post-sale confusion theory. Do you want us to confine our analysis to post-sale confusion? And initial interest. And even, and again, Your Honor. But not point-of-sale confusion. Not a point-of-sale, because I would not pursue that at trial. But even under a point-of-sale analysis, the court will weigh the evidence. Well, okay. It's a strong mark. The consumer care, you know, the price of the goods, that is often the best evidence of consumer care. You've got T-shirts, and they're being sold for $18 to $30, or hats. You know, these are not cars or jet engines. Intent, as this court's stated in the, let me find the, you know, in the beer nuts versus club foods case, one who adopts a mark similar to another already established in the marketplace does so at his peril, because the court presumes that he can accomplish his purpose. That is, that the public will be deceived. I mean, here, they're not just using affliction. They used, they incorporated it with the logo, which is a circle, in the Florida League. Drawing all inferences in favor of. Sometimes right side up, and sometimes. They flipped it. Always flipped it? Because in the trial order, Judge Kimball, in the second page of the trial order, shows affliction with the Florida League up and down. Yeah, it doesn't, well, the mark, the affliction mark, our mark is. The Florida League. Points down. Yes, always. See, vape afflictions mark, they've spun it both ways. Yeah, that's the question. But I, you know, Your Honor, I get that. Like, we used to call them goach cases, where they have this mark called the signature C. You probably see them on coach bags, and they face each other. And they'll do like a small little thing like that. But it still looks like a coach handbag. And that actually just shows intent, because it shows that they know the mark, and they figure, all right, if we change it around a little bit, it may be, you know, it may be convinced the Copyright Office or PTO to give us a registration on our goach mark that we can get away with it. And that has never flown. Does affliction, does the record tell us whether affliction licenses its use of its trademark? Of the word, the trademark affliction? Does it license it for use by others? You know, I could get back in court on that. I just don't have that up top. You could give us a lecture on that as well, I'm sure. I imagine they do license it. The point is that products, trademarks can be licensed. Of course. For use in related or unrelated products. Happens all the time, Your Honor. Happens all the time. And did Judge Kimball consider that, or was that argued to him, presented to him in any way? No. Thank you. No. I have two minutes left, unless the Court has any questions. I do have a question, but I don't want to steal your rebuttal time. But I had a question because I really didn't understand this aspect from either side. You all have briefed extensively the factors pertaining to the first cause of action. Trademark infringement under the Lanham Act. And there's four other counts. One, common law, unfair competition, et cetera. And everybody seems to be assuming that counts two through five are going to rise and fall based on what we do with count one. Assuming that the factors with regard to trademark infringement for, say, the counts four and five, or for the false designation of origin, are going to pertain exactly as they would for a trademark infringement under the Lanham Act. Is that your understanding? My understanding is the states may vary. But nobody's ever briefed any of the state factors. They may have varying factors, but likely to confusion. Again, my understanding, and I may be corrected by this Court, but my understanding is that likely could have confusion is kind of the core question of all of these counts. Okay. That it's an aspect of these various counts. Okay. That's my understanding. The rest of your time is preserved. Or reserved. Probably preserved as well, I suppose. Counsel, good morning. Good morning, Your Honors. My name is Matt Worm, and I represent the defendant and the affiliate in this matter. It's good to be with you this morning. The district court determined, based on the evidence in the record, that there is no likelihood of confusion between plaintiff's marks and the accused marks. Affliction initiated its lawsuit against Utah VAT and then chose not to take any depositions, not to retain any experts, not to perform a survey. And due to a lack of evidence in the record, the summary judgment record, summary judgment was entered. And affliction bases its appeal in large measure on its argument that the district court focused solely on plaintiff's sale confusion as opposed to initial interest or post-sale confusion. But the Tenth Circuit has been very clear in that regardless of the type of confusion that we're talking about, evidence needs to be submitted to help the court to weigh these factors, right? Because we're not talking about the theory of whether post-sale confusion could possibly be viable. Rather, the question here is whether, in this case, there is a likelihood of initial interest confusion or post-sale confusion. Well, if there is a T-shirt with Coca-Cola on it and it uses a Coca-Cola symbol that is internationally recognized, does Coca-Cola, in order to prevail on a likelihood of confusion theory, have to introduce any evidence other than the trademark itself and the trademark that is asserted to be a violation? I would say yes, Your Honor. So you would have to have somebody who would say, if you see affliction and it's in a circle and it's got a fleur-de-lis, and you look at this other one and it says affliction and it's got a circle and it's got a fleur-de-lis, somebody's got to tell me that I've got to be, as a judge, that I'm likely to be confused when it's evident to my naked eye? The evidence in the record doesn't have any... Your Honor, who was it who said, are you going to believe me or are you going to believe your lying eyes? No, and I understand the question. I think it's a good question. But with respect to the evidence that's in the record, there's not any evidence in the record that any of my client's products have been worn outside or seen by anyone, let alone that... Is that argued in your briefs? That what you just said? Yes. You argued in your briefs that the claim failed because there was no evidence that anybody had... There was no evidence presented that anybody had worn a vape affliction T-shirt outside their home? That fine point was not in the brief, Your Honor. That was in response to Judge Lucero's question. But what was in the brief is that there was no evidence submitted, including survey evidence and expert evidence that you typically see in cases like these. Affliction, it based its argument in large measure on a number of Ninth Circuit cases, and one out of the District of Oregon was, I thought, informative because it was one where they actually found it, that summary judgment should be denied because of the evidence that was produced based on post-sale confusion. But it's pages and pages and pages of evidence, consumer surveys, to show... Because we have to know, how does a consumer perceive this brand? Does the uniqueness of the symbol have any bearing on whether or not there's an obligation to furnish survey evidence or pages after pages? In other words, if you have a trademark infringement claim with regard to a cross or a five-edged star or a Star of David, these are common symbols that we see in everyday life. It's not often that we see a trademark symbol involving a fleur-de-lis. In fact, can you name any other brands that use a fleur-de-lis in their trademark symbol? I can think of a number, Your Honor. I think of the New Orleans Saints, for example. They have a fleur-de-lis. I believe the Catholic Church uses a fleur-de-lis. Okay. So if we're talking about the Catholic Church or the Saints, then we can assume that that's a frequent symbol. But does the uniqueness of the symbol, for example, the fact that we're not dealing with a cross or a star or a plus symbol or a circle, we're dealing with a fleur-de-lis, does that have any bearing on the interlay of the factors for wholesale confusion? I believe it could, Your Honor. The first element is similarity of the marks. And so we need to look at the marks in their totality, right? And certainly what we see here is what Affliction has presented is a side-by-side comparison of these marks. I think first it's important to understand that Affliction has two marks. It has a word mark, Affliction, and then it also has this logo mark that has the fleur-de-lis. Now, for the remaining factors, including strength, it appears that they're relying on Affliction, the word, not the fleur-de-lis mark to support strength. It's best, I think, to be really direct about this. You have a circle. And within the circle you have an inner circle. And that's common to both trademarks, correct? Yes, I will say that. Thank you, because I don't see how you can say no. I mean, it's like it's in front of me. And in the center of the inner circle on both the trademark and the contested trademark, there is a fleur-de-lis, correct? Correct. In one of them, the fleur-de-lis is upside down. In one of vape afflictions, it's upside down, correct? That's not correct. Well, what am I looking at here? I'm looking at the trial judge's order. So that's kind of my evidentiary base. Are you telling me that one of those is upside down and the other one isn't? Or am I so confused that I can't tell what's up and what's down? Well, they're stylized, and so it can be tricky to determine what direction they're in. But if you look at the tails that curve, the affliction is upside down. Well, I'm looking here, and at one, I've got an arrow pointing down. Here, I've got an arrow pointing up, and here I've got an arrow pointing down. I can't tell what's up, but I really can't tell what's up and what's down. But I trust your words. The yours is what, up or down? It's right-side up. Okay. All right. Next similarity is the word affliction. The type style on the trademark system is fairly clear. It's not the classical style that you use. But other than that, they're pretty similar, except that the little dots on the side, if you're looking really carefully, is actually a star on one and what appears to be a little blurb on yours. Or what do you call that thing on the side? Apparently, that's a dragon and a tiger. I see. But it wouldn't be evident to me, just looking at it, that it's a lion and a tiger, right? Right. Certainly not a star. Okay. What is not similar is that one has got a black circle and the word vape. Right? Correct. Now, if Affliction decided that they wanted to license the word affliction with vape, they couldn't do it, right? Because you're already doing it. That's correct, Your Honor, and Affliction doesn't offer vaping. But they could license the use of their trademark to somebody to use it. Potentially, they could license their product, their mark, yes. Right. So, back to my question. Is there evidence that is necessary other than the introduction of the trademarks and to let the fact finder make a determination of whether there's a likelihood of confusion? Repeat that one more time. I apologize. Is there a quantum of evidence that is necessary to be introduced in order to defeat a summary judgment motion other than the trademarks themselves and nothing else to allow the fact finder to see if there's a likelihood of confusion? Yes, Your Honor, there is a quantum of evidence. And what's the case that tells us what that quantum of evidence is? And there are a number of cases. Hornady is one case. Utah Lighthouse is another that describes the responsibility of the district court that says that it retains the important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination that there is a likelihood of confusion. And then we have the six-factor test that can be weighed proportionately depending on the context and facts of the case. And so, certainly, similarity of the marks is one of the factors. And what Judge Kimball or what the district court determined was that the appearance of the word vape and the fact that it connotes in the minds of the consumers that this is a vaping industry and not an apparel industry really affects the analysis with respect to similarity of the marks. And for that reason, he determined this was a neutral, if not slightly favoring, vape affliction for that reason. But that isn't based on evidence. I guess that's Judge Lucero's question here. The cases that you just described didn't say, oh, you can't just rely on the picture. You have to have evidence of surveys or whatever else you started with. Isn't that correct? Now, it's true that I've just never seen a case in the Tenth Circuit where they relied solely on one factor excluding all others. In fact, multiple cases find that, including Hornady, determined that strength of the mark and channels and different things favored the plaintiff and entered summary judgment regardless. And so that's certainly permitted for the court to review the evidence. And then it determines, based on that evidence, if there is a likelihood of confusion. In this case, with respect to post-sale confusion, I would submit, just as the district court did, that there simply was no evidence submitted that would allow us to know, what does a consumer believe about this product? What is its perception with respect to affliction of brand? We know that it has had sales, but does it have any negative perception as a result of our client's products? Exactly. What happens if you have a fastidious father who won't have a thing to do with smoking, any type of smoking, marijuana, nicotine, vape, whatever, and buys products for his kid that has affliction live larger, live fast, because the skateboard kids use the T-shirt and he likes that. All of a sudden, he sees vape on affliction. He says, oh, that company's affliction is now pushing nicotine on children. I don't approve of that. You cannot wear those T-shirts that I'm not buying anymore. Isn't that a negative impact? And again, yes, it would be, but it's a hypothetical, and it's not supported by evidence. On that one, you'd have to have evidence, wouldn't you? That's really the issue. We have no problem with the theory of post-sale confusion and initial interest confusion. In the right case, apply it. But in this case, we just simply do not have evidence to support it. The post-sale case is cited in the brief that actually prevailed. You see a mountain of evidence. You see actual confusion, and you see intent, and you see all these other factors that are recognized in Hornady and these other cases that have been decided by the Tenth Circuit. In regard to the similarity of the marks, there's one argument that you made in your briefs that I just did not understand, and so I'm going to give you a chance to explain it. You said that, well, we used affliction because addiction has negative connotations, and so we used affliction. Well, why are you talking about addiction anyway? I mean, I did not understand the logic of that argument. I mean, there's a lot of words that you could have started with, but where did the word addiction come from? Within the smoking industry, this is a vaping industry, and vaping is seen as a way to curb traditional tobacco smoking. It doesn't have the same chemicals. I don't understand why addiction would be a bad thing. Yeah, and so they were thinking of a brand that would sound like something that's appealing, something that you can't get enough of, but they didn't want to use the term addiction for obvious reasons because it has a negative connotation. So you wanted to have a positive word, so you started with a word with the worst possible connotation, addiction, and decided we're going to use a variation of this horrible word. I'm sorry, you're out of time, but I'm just… I'll just answer real quickly. That's what happened, and so we have an affidavit from our client saying that's how the name was originated. And so I can't speak to necessarily the business reasons behind that. That is just how it occurred, and the declaration was submitted to show that it had nothing to do with the fact that affliction existed, but rather there was a separate rationale for that. Thank you, Your Honor. Thank you. Counsel, you have some remaining time, and I think you've got some explaining to do, don't you? I mean, are you just trying to bring a case on the cheap where you're not going to have any evidence at all? You're just going to go up there, present two trademarks, and then rely on your sartorial skills to start arguing the case? Exactly, Your Honor. That's all you're going to do, huh? Your Honor, since clerking for the Fifth Circuit at the same time as judging for Judge Polizzi back in the day, I've done about 700 of these cases, and rarely do we do surveys. And usually the evidence that we presented in this case is the type of evidence you see in those. Well, what evidence is there? What is in this record? Certainly, Your Honor. The factors that count in the post-sale confusion case. The most prominent one in this one is strength of the mark. We presented evidence that affliction does $275 million in sales. So there is that evidence there. That's in the record. Over the last six years, and it's been around since 2005, that it spent over $3 million in the last six years on advertising. That its mark is arbitrary. In other words, it's an inherently distinctive mark, and it is incontestable. So this isn't like Hornady, where they spent, I think, $200,000 over the prior 20 years advertising their goods, or where you're looking at buying ammo at the point of sale. Strength of the mark is the overwhelming factor in this case. And again, I'm not going to say this is like Chanel or Coach or Burberry, but it's up there. Affliction has been around, and it is a well-known mark. The other evidence that's in the case, type of goods. I mean, you've seen, I put it in the briefs. You can see our goods, their goods. Both parties sell T-shirts, hats, tank tops. Similarity of the mark. That's in the evidence, Your Honor. You see our registered mark. You see how it appears on our goods, and you see how it appears on their goods. Is there any effort on VAPE's part to register their mark? I don't believe so. But there's no evidence of the record. I'm not aware of it. So it's essentially a registered trademark versus an unregistered mark. Excuse me, Your Honor? So it is essentially a registered versus unregistered mark? VAPE Affliction is a registered mark. Is that in the record also? Yes. Thank you. Well, we've been using ours since 2005, and it's incontestable. So we obviously have priority. Do we know the dates? Are the dates of registration in the record? Yes, Your Honor. That is all in the record. And to go to a question Judge Baccarat asked, you know, with the Florida League, I mean, if this was just about the Florida League, we would not be here. And it goes to the line of question, you know, they chose to use our name in the circle with a Florida League. It's unmistakable that they are trying to mimic our mark, my client's mark. You're out of time. I'm sorry. I apologize, Your Honor. I was not paying attention to my own remarks to my colleagues. Great. Thank you very much, Your Honor. Thank you. All right. Time has expired. Case submitted. Counsel.